DAVIS v. PERRY.

(Circuit Court, E. D. New York. December 26, 1901.)

PATENTS—INFRINGEMENT—INKSTANDS.

The Davis patents, No. 399,844, claim 1, No. 413,390, claims 1 and 3, No. 491,640, claims 1 and 2, and No. 605,177, claims 1 to 9, inclusive, all relating to inkstands having a float therein by the depression of which the pen is filled, each construed, and *held* not infringed.

In Equity. Suit for infringement of letters patent No. 399,844, issued March 19, 1889, No. 413,390, issued October 22, 1889, No. 491,640, issued February 14, 1893, and No. 605,177, issued June 7, 1896, all granted to Emry Davis for inkstands. On final hearing.

Walter S. Logan (Fred C. Hanford, of counsel), for complainant.
Clifton V. Edwards, for defendant.

THOMAS, District Judge. The bill is to restrain infringement of rights alleged to be secured to the complainant by several letters pat-

ent. The first of such letters, numbered 399,844, was issued in 1889. The only claim in question is:

"(1) The body or well, A, of the stand, having airtight cover, B, and tube, C, fitted in said cover, and reaching into the well and above the cover, B, in combination with the float, F, placed in the tube, the apertured cover, E, closing the upper end of the tube, C, and the dip funnel or tube, G, held fast in the float, F, and projecting up through the said cover, E, substantially as described."

The specification states:

"The object of my invention is to provide a cheap and practical inkstand, constructed to avoid almost altogether the evaporation of ink; and to this end my invention consists, principally, of a float and dip funnel, the float being placed loosely in a tube fitted in an airtight cover of the inkwell, so that pressure on the float will depress it, and cause the ink to rise and fill the pen. Upon removing the pressure the float rises and the ink recedes, so that only a very small surface is exposed to the atmosphere. The invention also consists of the construction and arrangement of parts, all as hereinafter described and claimed."

It will be observed that claim 1 describes certain parts: (1) The body or well; (2) the airtight cover, B; (3) the tube, C, fitted in said cover, and reaching into the well and above the cover, B; (4) the float, F, placed in the tube, C; (5) the apertured cover, E, closing the upper end of the tube, C; (6) the dip funnel or tube, G, held fast in the float, F, and projecting up through the cover, E. In defendant's infringing inkstand there is no cover, E, nor any equivalent thereof. Therefore in the defendant's stand there is one less element than is contained in the combination.

But it is urged that this element, to wit, the cover, E, is an unimportant and useless part of the complainant's invention. Such view cannot be accepted, inasmuch as the specification at all times designates the cover as a factor aiding the essential function of the combination, and, indeed, Davis seems to have so regarded it.

It may be inferred fairly that the complainant had two ends in view—First, to construct the stand so as to minimize evaporation; and, second, to adjust the parts so that, on pressure upon the funnel surmounting the float, the latter would be depressed, and the ink thereby forced through the float and funnel to meet the pen at a higher point than the level of the ink in the stand itself. For these two ends Davis regarded an airtight chamber as a necessity. In the specification he says:

"In the cover, B, is fitted the tube, C, which reaches nearly to the bottom of the inkwell, and projects somewhat above the plate, B2, where it is provided with the small ring, D, in which fits the small annular cover, E, for the tube, C. The tube, C, is formed with a flange, b, and the central opening of the rubber disk, B', is drawn in close contact with this flange, so that the said tube is held airtight in the cover, and over or above the flange, b, is placed the small soft rubber ring, d, to act in connection with the soft rubber disk, B', to make an airtight connection between the tube and cover. The ring, D, is screwed upon the upper end of the tube, C, and serves as a nut to connect the tube to the cover, and when screwed down the ring, d, is compressed between the flange, b, and the inner surface of the outer cover, B2. The outer edge of the soft rubber disk, B', is by preference somewhat thickened or enlarged, as shown at f, to form a cushion between the upper edge of the ink well or stand, A, and the flat portion, f', of the metal cover, B', so that when this outer cover is screwed down upon the threads, g, of the inkwell, the cushion, f, will be compressed, and

the cover as a whole made airtight upon the stand, A. In the said tube, C, is placed the float, F, in which is fitted the funnel or dip tube, B, which reaches up through the annular cover, E. The lower end of the tube, G, is open at the bottom to receive the ink."

From this it will appear that Davis intended by the cover, B, and the annular cover, E, to make his inkwell airtight. This would prevent evaporation, and the manifestation of care to bring about an adjustment that would delicately close the inkwell indicates that he regarded the containment of the air in the well as necessary to force the ink through the float, when the same should be depressed, and also to aid in preventing the ink from rising too freely between the float and the tube.

The defendant's stand is relatively a simple structure. Although a cover is provided, it does not make an airtight connection with the well, as it is held in position by gravity alone. Otherwise, defendant's cover does take the place of the cover, B, and while it is not fastened to the well, and is removable at once, yet when resting upon the well the air is practically maintained therein. But the annular cover, E, is entirely wanting. The float and the funnel are integral, and while the flaring funnel, when the float is depressed, rests upon the cover, closing the mouth of the tube, it does not closely engage the same, nor is there any connection which makes, or is intended to make, the well airtight. Therefore, unless the claim may be recast, and the patentee's conception that the well should be airtight, and that there should be an annular cover for the purpose of effecting this, may be rejected, upon the theory that the results desired would be obtained quite as well otherwise, no infringement is shown. Such recasting of the claim and reversal of the patentee's conception is not justified.

The next inquiry relates to the infringement of letters patent No. 413,390, issued October 22, 1889. The claims alleged to be infringed are as follows:

"(1) An inkstand provided with a cover, combined with a tube fitted in the cover, a float placed in the tube, a dip funnel fitted in the float, and a check placed in the passage of the float, substantially as and for the purposes described."

"(3) The cover, B, formed with the plate, E, and dome, F, having opening, f, the said dome and plate forming a space, G, substantially as and for the purposes set forth."

It was found, upon a depression of the float in the usual introduction of the pen, that the ink would spurt from the funnel. To use the words of the patentee:

"The invention consists, principally, in the employment of a check in the ink passage through the float to prevent the ink from being forced in a jet up into the dip funnel. The invention also consists in the employment of a double-walled cover forming a chamber to catch and return any overflow of ink. The invention finally consists in the construction, arrangement, and combination of parts, all as hereinafter described and claimed."

Respecting the check the specification states:

"The dip funnel screws into the top of the tube, D', and its lower end is formed with the check, i, which prevents the ink from being forced in a jet up into the funnel when the float and funnel are forced downward by pressure on the pen placed in the funnel. The check, i, instead of being

made a part of the funnel, may be placed anywhere in the passage, D'. The ink, after passing the check, 1, enters the funnel through the openings, 1', above the check."

The defendant's combination has an entirely dissimilar device for checking the flow of ink. Through the float as used by both parties runs a cylindrical tube through which the ink rises. The defendant contracted such opening at the base of the float, enlarging its diameter as it proceeded upwards, so as to restrict the entrance of the ink at the lower extremity, and facilitate its passage as it continued to arise. This is the only check used by the defendant. The particular provision for checking described by the complainant is entirely wanting. But it is urged that the claim is sufficiently broad to cover any checking device, whatever the mechanical arrangement. No such enlarged conception seems to have been held by the patentee, and none is described in the letters. It is thought that the claim cannot be broadened so as to prevent any person from ever using any form of check that would impede the free flow of the ink. What the complainant really did was to convert the lower end of the funnel into a plug, arresting for the moment the flow of the ink, and then allowing it to again enter apertures in the funnel, and so find its way upward, or, as complainant's expert describes it:

"The device described in the second patent, which should act as a check for preventing squirting of the fluid up into the tube, consisted essentially in dividing the tube into two parts, and interposing between the parts a device which would interfere with the upward flow of the fluid in the volume which it was received at the bottom of the ink tube. In other words, the funnel at the top of the inkstand is provided with a prolongation with lateral openings, and the funnel suitably secured to the top of the ink tube. The ink in rising through the tube strikes the closed end of the prolongation of the funnel, passes through the lateral opening, and thence upward into the funnel. This device effectually prevents squirting."

It will be observed that the defendant's interior tube is straight, and that the checking is effected by a gradual enlargement of its diameter. There is no division of the tube into parts, nor interposition between the parts of a device graduating the upward flow of the ink received at the bottom of the tube. There are no lateral openings in the tube, nor does the ink in rising strike the closed ends of a prolonged funnel. Claim 1 of this patent is not infringed.

Claim 3 relates to an overflow chamber, and is elaborately described and diagrammatically represented in detail in the specification. In important particulars the description given in the letters first considered is applicable, save as to the check and the overflow chamber itself. The intention seems to be to form a chamber above the top of the float that should receive any overflow of ink, the upper walls of such chamber being formed by the cover of the inkstand and the smaller annular cover placed thereon. It is difficult to find any corresponding device in the defendant's stand. Defendant's stand No. 1 shows a tube of increasing diameter from the bottom upwards, and near the outer opening such diameter is abruptly increased, and the shoulder thereby formed at the point of enlargement would, to a slight degree, interrupt ink that might come into the upper portion of the tube from flowing back into the tube. But the absence of the cover, which was

discussed in the first patent, permits the ink to flow out of this chamber upwards, the dome, F, is entirely wanting, as is the opening, f, and if the space, g (the intended ink chamber), may be found, it is of very trivial dimensions. It is difficult without employment of much imagination to find in the slight enlargement of the superior portion of the tube the elaborate overflow chamber described in the complainant's letters, and it is considered that infringement is absent.

The next inquiry relates to letters patent No. 491,640, issued February 14, 1893. Claims 1 and 2 are alleged to be infringed, and are as follows:

"(1) An inkstand having a buoyant vertically movable ink supply tube, provided with air inlets at its lower end, and a flange or rim at the top of the pen cup at its upper end, and having the inlet for the ink at its lower end contracted, and means for holding said tube in equilibrium, for regulating the point of equilibrium of said tube, and for filling the inkstand and an ink overflow chamber surrounding said tube, eccentrically thereto, substantially as shown and described, for the purpose specified.

"(2) An inkstand having a buoyant vertically movable ink supply tube, provided with air inlets at its lower end, and a flange or rim at the top of the pen cup at its upper end, and having the inlet for the ink at its lower end contracted, and means for holding said tube in equilibrium, for regulating the point of equilibrium of said tube, and for filling the inkstand, and an ink overflow chamber surrounding said tube eccentrically thereto, and means for connecting the cover with the well, substantially as shown and described, for the purpose specified."

The essential element is means for holding the tube (tube here means float) in equilibrium, for regulating the point of equilibrium of the tube, and for filling the inkstand. This is to be done by means of "an ink overflow chamber surrounding said tube, eccentrically thereto, substantially as shown and described."

In defendant's inkstand there is no overflow chamber, eccentric to the tube, into which the air is admitted through a "plug controlled aperture," as described in the letters. On the other hand, the defendant's tube or float is placed in the inkwell so that the bottom thereof is recessed into the bottom of the inkwell, and rests upon a rubber disk, and air is admitted to the float through an aperture in the bottom, by raising the float as desired. There is no plug-controlled aperture in an eccentric chamber. It is not understood how a claim that demands an eccentric overflow chamber can be broadened to cover a device which includes a concentric overflow chamber, even if such exists.

The second claim differs from the first only in providing "means for connecting the cover with the well." The specification states:

"Within the mouth of the well is held an elastic rubber ring, 13, to insure an airtight joint between the well and the cover of the inkstand, and also to exclude dust and impurities. The cover is preferably constructed of vulcanized rubber, although other suitable material may be employed, and consists of an annular flange, 14, having a central circular aperture, 15, for the reception of the buoyant ink tube."

Nothing of the kind is discoverable in the defendant's stand. It is concluded that there was no infringement of these letters.

The next question relates to letters patent No. 605,177, issued June 7, 1898. The claims alleged to be infringed are 1, 2, 3, 4, 5, 6, 7, 8,

and 9. All these claims express a combination which is an alleged reduction of the patentee's devices already considered to two elements, an open inkwell and a float. The well itself, save as hereafter stated, is represented as of uniform diameter, and intended to receive a "float, being of a form and adapted to substantially wholly occupy the interior of said reservoir, whereby air is excluded from said fluid other than through the center of the float" (claim 1); a "float substantially occupying the interior of the reservoir, and fitting wholly within the same" (claim 2); a float "having exteriorly longitudinal and lateral dimensions and form approximately corresponding to those of the interior of the reservoir" (claims 3, 4, 5); a "float laterally fitting the walls of the reservoir, and longitudinally formed so that when resting upon the bottom of the reservoir it will project above the top of the same" (claim 7); a float "formed to telescope within said first part or reservoir, and closely fit the wall thereof," and of the same length (claim 8).

However, claims 6 and 9 read:

"The longitudinal and lateral dimensions of the float, being substantially, equal to the corresponding dimensions of the interior of the reservoir, and said reservoir being provided at the top thereof with an annular overflow chamber, the inner wall of which is formed by said float" (claim 6); "said reservoir being of a uniform width throughout the major portion of its interior, and being of an increased width at the top thereof, to form a vertical annular groove or recess itself of uniform width, said upper recessed portion of the reservoir being wholly open at the top to permit the free insertion and removal of the float" (claim 9).

This recess is shown in the diagram (Fig. 1), and corresponds with that employed by the defendant, as already described. The specification states:

"I do not claim, broadly, in this application the construction of the tubular float, which forms an element of my previous patents hereinbefore referred to, and particularly of patent No. 491,640, granted February, 14, 1893, nor do I claim, broadly, an overflow chamber, the subject-matter of this application being the combination of such a float directly with the interiorly cylindrical reservoir, 5, whereby I dispense with intervening elements of construction, and form a perfectly operating inkstand, which consists of two parts, it being noted that I dispense with an outer supply reservoir and an interior feed reservoir, and combine said parts in one for the particular purpose of such a form of device which I have herein shown, and that I fit the tubular float in direct engagement with the inner walls of the reservoir, instead of providing the separate interior guide which the feed reservoir of the aforesaid patent constitutes, whereby air was admitted to the ink from outside the float and a circumferential air chamber formed, thereby necessitating the provision of means for equalizing or regulating the pressure of the air upon the ink at all times, and it will further be observed that the overflow chamber, 16, in this device is formed in the inner walls of the reservoir. * * * It is further to be noted that by this invention I dispense with all the auxiliary mechanism, and provide a two-part inkstand, in which there are no covers, in which the reservoir is entirely open at the top, except for being closed by the float, as herein stated, and that these two parts are mutually detachable directly without manipulation."

In other words, the devices provided for in the former patents are all dispensed with, save an inkwell and float, and concerning the float no peculiarity of construction is claimed.

It is urged that the invention consists in the reduction and elimina-

tion of a number of parts regarded as serviceable in the old device. But the defendant's inkstand consists of three parts,—a float, and an ordinary inkwell, in which is placed a relatively small tube with an apertured cover, which closes the mouth of the well. This tube has a small circular perforation in its base, and when in position the ink may flow from the main well through this aperture into the tube. Hence, while the general supply of ink is in the outer well, it rises through the aperture in the float to a degree, and also rises freely and much higher about the tube, whose diameter is much less than the diameter of the well itself. Into this tube a float is placed, corresponding with the float illustrated in the complainant's patent. Therefore, while there are but two parts in the complainant's stand, there are three in the defendant's. The complainant may store only such ink as may be contained in the tube, to which the float corresponds nicely, to the extent above noted, while in the defendant's stand the ink is largely contained in the outer well, and is allowed to rise into the interior tube to an inconsiderable degree, through the inferior end thereof.

If the complainant's patent may be sustained at all, it is on account of its simplicity and the elimination of parts. It is true that if the aperture in the defendant's tube were closed; and ink were poured into it, it would be the device described in the letters. But such is not the case, and there is obvious utility in the additional element employed by the defendant. If a combination show invention, by the elimination of all parts save two, it is not perceived how the addition of a third useful element is an infringement; and if it be answered that the device would be equally valuable if the new part were also eliminated, then the burden would rest upon the complainant to make proof that the additional element is only colorable. While it is perfectly apparent that the tube might be closed, and that upon such suggestion infringement could be found, it is equally apparent that it could not be closed without impairing the value of the stand.

In view of these considerations, it is not deemed necessary to consider the prior art with reference to the several letters issued to the complainant.

The bill should be dismissed, with costs.